**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

BRIAN HELLING

      Plaintiff,

v.

ALLSTATE INSURANCE COMPANY,

      Defendant.

Case No.: 2024-CV-00111

Honorable Scott W. Skavdahl
Honorable Scott P. Klosterman

**ALLSTATE INSURANCE COMPANY'S *DAUBERT* MOTION
TO EXCLUDE EXPERT TESTIMONY OF JEFFREY E. NEHLS**

Defendant Allstate Insurance Company ("Allstate"), by and through counsel, and pursuant to Federal Rule of Evidence ("FRE") 702, hereby submits this *Daubert* Motion to exclude Plaintiff Brian Helling's ("Helling") expert Jeffrey E. Nehls ("Nehls") as an expert witness. In support hereof, Allstate states as follows:

## I.   <u>INTRODUCTION</u>

Plaintiff's expert Nehls issued a report and provided testimony concerning the measure of Helling's alleged consequential damages stemming from Allstate's decision to terminate its relationship with Helling. Nehls' testimony (Pl.'s Expert Designation, ECF No. 24.) on Helling's alleged consequential damages—a lost revenue stream from Helling's Allstate Exclusive Agency ("Agency") and the value of Helling's economic interest in the accounts he serviced on behalf of Allstate ("economic interest") 19 years from now—should be excluded from trial for three reasons: (1) Nehls is not qualified to offer an expert opinion on the business value of an insurance agency; (2) Nehls' opinion on Helling's worklife expectancy does not "fit" the facts of the case; and (3) Nehls' report provides an insufficient basis by which to assess the reliability of his methods. Consequently, Nehls should be disqualified from testifying and/or offering any opinions at trial.

## II.   <u>BACKGROUND</u>

### A.   **Explanation of the Claims**

From 2014 to 2022, Helling owned an economic interest in and operated the Agency. (Compl. ¶ 6, ECF No. 1-A.) The Agency was not Helling's only source of income. Helling previously sold real estate, and he opened a real estate business in 2020. (Deposition of Brian Helling ("Helling Dep.") at 89:22–90:7; 92:3–5.  A true and correct copy of the Helling Dep. is attached hereto as **Exhibit A**.) Following the opening of his real estate business, Helling's Agency suffered a sharp downturn in business as highlighted in Greg Weiss, Allstate's expert the preliminary expert report of:



(Weiss Report, ECF 28-1 at 22.) In short, Helling stopped focusing on his Agency and meeting Allstate Agency Business Objective ("ABO") program requirements. (Ex. A, Helling Dep. at 116:15–117:19). As a result, the revenue of the Agency dipped forty percent between 2020 and 2022. (Deposition of Jeffrey E. Nehls ("Nehls Dep.") at 58:14–19. A true and correct copy of the Nehls Dep. is attached hereto as **Exhibit B**.)

In August 2022, Allstate notified Helling it would be terminating its relationship with him because he failed to meet the Allstate ABO program requirements. (Compl. ¶ 19, ECF No. 1-A; Ex. A, Helling Dep. at 10:11–23.) Although every Allstate Exclusive Agent ("EA") signs the R3001 Agreement ("R3001 Agreement") before becoming an EA, Helling alleges that he never signed an R3001 Agreement. (Compl. ¶¶ 20, 24; ECF No. 1-A).

Prior to the termination of his relationship with Allstate, Helling had the opportunity to sell his economic interest. (Compl. ¶ 22, ECF No. 1-A.) Under the terms of the R3001 Agreement, Allstate had "sole discretion" to approve or deny any potential buyer. (Ans. ¶ 31, ECF No. 7.) After Helling notified Allstate that he was negotiating the sale of his economic interest, Allstate determined the potential buyer did not meet the eligibility requirements and did not approve the prospective buyer. (Compl. ¶¶ 28, 31, ECF No. 1-A; Ans. ¶¶ 28, 31, ECF No. 7.) Helling did not attempt to find another buyer to purchase his economic interest and, instead, chose to accept a

2

Termination Provision Payment ("TPP") from Allstate in exchange for his economic interest. (Ex. A, Helling Dep. at 144:4–17.)

### B.    Nehls' Background and Report

Helling retained Nehls as an expert to testify to the consequential damages Helling alleges he suffered from Allstate's termination. (Pl.'s Expert Designation, ECF No. 24.)  As an economist, Nehls' stated area of expertise is in "litigation-related consulting projects regarding personal injury, wrongful death, employment termination, and business disputes." (Nehls Report, ECF 24-1 at 54.) Moreover, his expert credentials reflect no experience in valuing insurance agencies or other, similar businesses. (*Id.*)

About one half of Nehls' 59-page report is a document containing generalized explanation and analysis of economic and wage-related data. (Nehls Report, ECF 24-1 at 10–38, App'x. B.) The rest of the report contains a recitation of Helling's financial and employment situation, (*id.* at 1–4); a write-up of Nehls' analysis, (*id.* at 4–8); an Appendix identifying the sources used; (*id.* at 9, App'x. A); and Nehls' curriculum vitae ("CV") and litigation history (*id.* at 53–59, App'x. C). Missing from his CV and litigation history is any mention of the two cases in which his expert opinion was disqualified in whole or in part. (*Compare* Ex. B, Nehls Dep. at 32:20–33:6; 36:9–38:12 *with* Nehls Report, ECF 24-1 at 54–57.)

In his report, Nehls opined that, "an aggregate fund of $925,800 will compensate…Helling for the probable economic losses from the date of the incident to the date of trial in April 2025 and replace the future lost stream of earnings" from the Agency. (Nehls Report, ECF 24-1 at 6.) Nehls derived his ultimate conclusion from two figures: purported lost earnings (past and future) and lost future business value of the Agency. (*Id.* at 4–8.) Nehls identified a number of sources that informed his opinion, but notably did not ask for, receive, or evaluate Helling's full tax returns, only his tax transcripts. (Ex. A, Nehls Dep. at 49:10-18.)  To evaluate Helling's purported lost

3

earnings, Nehls estimated Helling's projected future lost earnings *but for* the termination of his relationship with Allstate, adjusted for inflation. (*Id.* at 4–5.)

In his analysis on purported lost business value from a future sale of Helling's economic interest, Nehls applied two market multiples he found through a search on google or google scholar. (*Id.* at 5; *see* Ex. B, Nehls Dep. at 110:1–20.) Specifically, Nehls applied a 5x earnings multiple and a 1.5x–2.5x revenue multiple. He concluded that these two measures result in an approximate valuation of Helling's economic interest of $400,000 **in 2044**. (Nehls Report, ECF 24-1 at 5.) For the market multiples, Nehls cited two webpages: one from sicafletcher.com (a pdf of the cited webpage is attached and incorporated as **Exhibit C**), and one from peakbusinessvaluation.com (a pdf of the cited webpage is attached and incorporated as **Exhibit D**). (*Id.* at 5, n.4.) Both websites contain hard-to-miss notices disclaiming their usefulness for valuing *specific* insurance agencies and highlight the importance of a fact-specific analysis when determining the sale value of an insurance agency. (*See* Ex. C at 1; Ex. D at 4.)

Citing generalized worklife data in the vast Appendix B of his report, Nehls assumed that Helling would continue working until he was 65 years old—for 19 more years. (Nehls Report, ECF No. 24-1 at 4, n.1.) Accordingly, Nehls' ultimate conclusion reflects 19 years of projected future earnings and the projected value of the economic interest upon a sale 19 years in the future.

### III.    LAW AND ARGUMENT

#### A.    Standard Under Rule 702 and *Daubert.*

Helling bears the burden of proof to establish the admissibility of Nehls' expert testimony. FRE 702; *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 n.10 (1993); *U.S. v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). Under FRE 702, a proposed expert's opinion is admissible if (1) the witness is qualified by knowledge, skill, experience, training, or education; (2) the testimony is relevant; and (3) the testimony is reliable. *Id.*; *Kumho Tire Co., Ltd. v.*

4

*Carmichael,* 526 U.S. 137, 151 (1999) (holding that *Daubert* applies even when an expert's opinion relies on skill or experience-based observation). In *Daubert*, the Supreme Court established guidelines for district courts to use in determining the admissibility of expert testimony pursuant to FRE 702 and 104. The district court must ensure that all expert evidence is based "on a reliable foundation." *Daubert*, 509 U.S. at 596–97. Thus, the district court takes on a "gatekeeper" role, charged with the responsibility of excluding unreliable expert evidence. *Id*.

**B.      Nehls' Opinion on the Agency's Lost Business Value Is Inadmissible Because Nehls Is Not Qualified and Used Unreliable Methods to Reach his Conclusion.**

To determine the admissibility of expert opinions, courts first determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion. Then, courts assess whether the expert's opinions are sufficiently reliable. FRE 702; *Kumho Tire Co.*, 526 U.S. at 151; *Daubert*, 509 U.S. at 596–97 (1993); *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). Nehls' opinion on the revenue stream and future value of the economic interest fails at both steps as he is wholly unqualified to speculate on the value of an insurance agency, and the methodology Nehls applied in evaluating the Agency's value is unreliable on its face.

> 1.      *Nehls is not qualified to opine on the value of a Wyoming insurance agency 19 years in the future.*

An expert must possess "knowledge, skill, experience, training or education" with respect to the disputed issues of fact in the case. FRE 702. Indeed, courts in the Tenth Circuit routinely exclude expert testimony that falls outside "the reasonable confines of [the expert's] subject area." *Ralston*, 275 F.3d at 970; *Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1093 (W.D. Okla. 2009) ("[T]he expert's qualifications must be both (i) adequate in a general, qualitative sense . . . and (ii) specific to the matters he proposes to address as an expert.").

5

Nehls is not qualified to opine on lost income from an insurance agency because his primary litigation experience is in personal-injury cases, and he has no experience valuing insurance agencies. (Ex. B, Nehls Dep. at 13:4–22, 20:5–10.) Further, Nehls failed to supplement his lack of experience in valuing insurance agencies with additional research. (*Id.* at 43:8–19; 119:20–120:2.) Consequently, Nehls can offer no opinions on the sale value of Helling's economic interest. Far from the specialized "knowledge, skill, experience, training or education" that qualify an expert to give testimony, Nehls demonstrates a lay understanding of the structure of insurance sales. For example, in his deposition, Nehls articulated a complete misunderstanding of the difference between an "exclusive" agency—such as the one that Helling had operated—and an "independent" insurance agency.  (*Id.* at 12:12–13:1.) This distinction is crucial and yet Nehls chose to conduct no research on the differences in valuation methods that are used in evaluating independent versus exclusive insurance agencies. (*Id.* at 14:17–15:13; 28:23–29:5; 140:23–141:3.)

Further, Nehls did not try to identify sales of comparable insurance agencies to learn about the industry or market (*Id.* at 130:15–131:6.), nor did he attempt to learn about Helling's competitors. (*Id.* at 118:15–119:19.) Nehls' failure to do so and lack of specialized knowledge is especially glaring given that he testified that both the economic outlook of the specific business and the market the business is in are relevant to a valuation analysis. (*Id.* at 129:9–13.)

In addition, Nehls has never provided an evaluation for the sale of a business 19 years in the future. (*Id*. at 97:3–12.)  Even assuming that there exists a methodologically sound way to estimate the value of a business 19 years into the future (there is not), Nehls is unaware of any treatise, text, or other authority that provides for such a method. (*Id.* at 105:13–106:16.) In short, Nehls wades out of "the reasonable confines of [his] subject area," *Ralston*, 275 F.3d at 970, when he opines on the lost earnings and economic interest value of the Agency. His "knowledge, skill,

6

experience, training or education" do not qualify him to reach the conclusion that he did. FRE 702. And that lack of qualification led Nehls to apply an unreliable method in valuing Helling's economic interest. Accordingly, Nehls must be disqualified from testifying at trial.

2.      *Nehls' lack of experience led him to rely on unreliable sources*

Courts may exclude expert testimony if "the expert's data, method, or his application of the method to the data" are unreliable. *Nacchio*, 555 F.3d at 1241; FRE 702(d). An expert's testimony must contain sufficient grounds to allow the district court to assess the reasoning and methodology underlying the expert's opinion." *U.S. v. Rodriguez-Felix*, 450 F.3d 1117, 1125 (10th Cir. 2006) (citations omitted). "Under Daubert, any step that renders the expert's analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999) (alterations in original).

Nehls purports to provide a valuation figure based on two market multiples plucked from the internet: one from sicafletcher.com and one from peakbusinessvaluation.com. (Ex. B, Nehls Dep. at 110:16–20; *see also* Ex. C; Ex. D.)  Respectively, those sites say that a 5x EBITDA multiple or 1.57x–2.41x revenue multiple provide guidance on the value of an insurance agency. Neither the websites themselves nor Nehls' testimony provides assurance that these market multiples are reliable. In fact, and to the contrary, the two web pages expressly state that they are unreliable and should not be relied on when calculating the value of an insurance agency. Both contain disclaimers cautioning users from relying on the web pages alone for valuation purposes. (*See* Ex. C at 1; *see also* Ex. D at 4.) Despite the unequivocal warning on sicafletcher.com, Nehls refused to consult sicafletcher.com's Insurance Agency Value 101, (Ex. B, Nehls Dep. at 141:19–142:6), opting for the "quick and easy" method and the "rough estimate" over the "comprehensive description" and "thorough understanding." Likewise, Nehls ignored the disclaimer on peakbusinessvaluation.com

stating, in part, that "***the information provided does not constitute valuation advice.***" (Ex. D at 4 (emphasis added).) Thus, both web pages are (at best) "rules of thumb" or sanity checks before a more fact-specific valuation analysis is conducted. (*See* Weiss Report, ECF No. 28-1 at 24, 24 n.57 (citing *Understanding Business Valuation*, 6th Ed., at 970).) The web pages, themselves, acknowledge as much.

Nehls acknowledged that he knew about the disclaimers, and agreed that "solely relying on an Internet article with a disclaimer like this would not rise to the level of being able to testify to a reasonable degree of certainty[.]" (Ex. B, Nehls Dep. at 142:13–19, 146:25–147:3.) Yet, Nehls did nothing to verify that the market multiples in those web pages are reliable methods for valuing an insurance agency, much less an economic interest in an Allstate Agency. In sum, Nehls failed to verify the valuation methods he found through a google search—methods that Nehls admits are unreliable on their own terms. This methodological misstep signals Nehl's lack of qualification, and the appeal to unreliable methods is sufficient grounds to exclude his testimony.

**C.      Helling's Projected Worklife Is a Poor "Fit" to Estimate the Longevity of the Agency and Helling's Projected Future Income but for the Termination.**

Under *Daubert*, the district court must assess both the reliability of the methods applied and the relevance of the testimony to the issues of the case. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2005). If there is too great a gap in "the logical relationship between the evidence proffered and the material issue that the evidence is supposed to support," then the testimony does not "fit" the facts of the case—it is not sufficiently relevant to be admissible under Rule 702. *Id.* (quoting *Daubert*, 509 U.S. at 591).

Nehls' damages conclusion relies on his opinion regarding Helling's "worklife"—that is, that Helling will continue working until he is 65 years old. Nehls' projections of Helling's damages incorporate this assumption. But Helling's projected worklife on its own is a poor "fit" to the

8

question of his future projected earnings from the Agency or the future value of Helling's economic interest. Helling may have expected to operate the Agency until retirement, but he had no contractual right to do so, and he had no promise from Allstate that he could do so.  (Ex. B, Nehls Dep. at 70:13–17.)

Moreover, Nehls provides no reason to assume that Helling's Agency would have continued apace for 19 more years. Helling operated the Agency under an at-will agreement; his revenue had dipped almost forty percent between 2020 and 2022, (*id.* at 58:14–19); and there are many unaccounted-for variables that render Nehls' worklife estimate irrelevant. Nehls acknowledged several of these unaccounted-for variables at his deposition, including: Helling may have stopped selling insurance, (*id.* at 61:12–16); Helling's Agency could have continued to decrease in sales, (*id.* at 61:17–20); Helling could have decided to pursue his real estate business full time, (*id.* at 62:22–63:2); Helling could have simply decided to spend proportionately more of his time on his real estate business, leading to a decline in his Allstate income, (*id.* at 124:9–125:1); and Market forces in the insurance industry could make selling insurance more or less attractive to Helling over the next 19 years, (*id.* at 104:3–7).

In short, the possibility that Helling would continue to operate the Agency for another 19 years is anything but a given. Consequently, the worklife assumption simply does not "fit" the facts of the case because there is an "impermissible analytical gap . . . between premises and conclusion." *Bitler*, 400 F.3d at 1233.

### D.    Nehls' Fails to Provide Sufficient Grounds to Assess the Methodology He Used to Project Helling's Projected Future Income from the Agency.

Nehls fails to explain the methodology he used to determine one of the variables that is foundational to his conclusion: the 65-year worklife determination. His report contains a 29-page "Primer" containing a dizzying amount of economic data on earnings and high-level analysis of

the labor market. (Nehls Report, ECF No. 24-1 at 10–38, App'x. B.) In that Primer, Nehls states, "A proper economic appraisal not only requires *client-specific information* but also must rely on a wealth of …data to identify the appropriate logic and assumptions utilized in the loss calculations." (*Id.* at 10) (emphasis added). Yet, Nehls fails to abide by this statement as there is no connection between the "wealth of…data" contained in the Primer and Helling's "client-specific information."

For example, Nehls opines that Helling's 2021 and 2022 Agency earnings would have continued for 19 more years, and that Helling would have sold his economic interest in 19 years (i.e., in 2044). (*Id.* at 4.) Helling's worklife is not a relevant measure of his future projected income from the Agency but for the termination. Further, Nehls' Report provides inadequate grounds to assess the soundness of his methodology in reaching this opinion. In support of this opinion, Nehls cites "additional information and sources" in the Primer contained in Appendix B. (*Id.* at 4 n.1.) The two pages in the Primer on worklife expectancy contain no reference to Helling, to the specifics of the relationship between Helling and Allstate, or to Helling's performance as an Allstate EA. (*See id.* at 45–46.) Instead, that portion of the Primer contains generalized explanations of average worklife figures from a disaggregated list of thirty-one sources. (*Id.*) It also contains a disclaimer: "[T]here is no age- certain retirement that can be 'plucked' from a chart; rather the full array of data and particulars of the instant case should be used." (*Id.* at 45.) Yet, instead of providing a "full array of data and particulars," Nehls performs no analysis in reaching his opinion that Helling would continue working for 19 more years. In failing to do so, Nehls contradicts his own warnings that experts who "pluck" worklife expectancy from a chart should be disqualified.

## IV.    CONCLUSION

For all of the foregoing reasons, Allstate Insurance Company's *Daubert* Motion to Exclude Expert Testimony of Jeffrey E. Nehls should be GRANTED.

10

Dated: March 3, 2025

Respectfully Submitted,

By: */s/ J. Scott Humphrey*
J. Scott Humphrey (admitted pro hac vice)
Benesch, Friedlander, Coplan & Aronoff LLP
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone:  (312) 212-4949
Facsimile:  (312) 767-9192
Email: shumphrey@beneschlaw.com

Noelle B. Torrice (admitted pro hac vice)
Benesch, Friedlander, Coplan & Aronoff LLP
1313 North Market Street, Suite 1201
Wilmington, Delaware 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
Email: ntorrice@beneschlaw.com

Ronald J. Lopez
Bailey Stock Harmon Cottam Lopez LLP
6234 Yellowstone Rd.
P.O. Box 1557
Cheyenne, WY 82003
Phone: (307) 638-7745
Fax: (307) 638-7749
Email: ronnie@performance-law.com

*Attorneys for the Defendant Allstate Insurance Company*

11